UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PRECISION SHOOTING EQUIPMENT,
INC.,

        Plaintiff,

v.                        CASE No. 8: 00-450-CIV-T-17-TGW

GOLDEN EAGLE INDUSTRIES,
LLC, NORTH AMERICAN
ARCHERY GROUP, LLC, and
CHARLES L. PALMER,

        Defendants.
_____

REPORT AND RECOMMENDATION

      A hearing has been conducted in this case pursuant to Markman

v. Westview Instruments, Inc., 52 F.3d 967 (Fed. Cir. 1995), aff'd 517 U.S.

370 (1996), to consider the construction of certain terms in two patents that

are at issue in this lawsuit. Based upon the information that has been

presented, I recommend that the six terms that were the focus of the hearing

be construed as plaintiff contends. With respect to an additional issue raised

by the defendants at the hearing, I recommend that resolution of that matter

be deferred until trial. Moreover, since the presentation of these matters was

limited to memoranda and argument and did not include any testimony, expert or otherwise, these recommendations are not made with the usual assurance. Consequently, I suggest that action on all of the recommendations be deferred until the evidence has been adduced at trial.

I.

This suit involves United States Patent Nos. 4,739,744 ('744 patent) and 5,040,520 ('520 patent), which reflect inventions by David J. Nurney and are the basis for the plaintiff's claims of patent infringement against the defendants (Doc. 100, Exs. A, B).   The patents concern improvements made to an archery bow involving pulleys at the end of the bow limbs that make the arrow travel greater distances with more accuracy (id. at Ex. A, cl. 4).  The '744 patent, which is styled "High Energy Limb Tip Cam Pulley Archery Bow" was issued on April 26, 1988, based upon a November 1, 1982, application (id. at Ex. A).  The '520 patent, entitled "Limb Tip Cam Pulley for High Energy Archery Bow," was issued August 20, 1991, based upon a February 25, 1988, application (id. at Ex. B).[1]

_____

[1]The '520 patent was filed as a divisional of the '744 patent.  The specification of the '744 patent is virtually identical to that of  the '520 patent.

Plaintiff Precision Shooting Equipment, Inc. ("PSE"), is a manufacturer of archery bows and related accessories, to whom Nurney assigned these patents (Doc. 1, ¶9). Defendant companies Golden Eagle Industries, LLC, and North American Archery Group, LLC, and individual defendant Charles Palmer, are in the same business as the plaintiff and are alleged to have made, used, sold or offered to sell archery bows that infringe upon one or more patent claims of the '744 and '520 patents (id. at ¶¶ 11-17). The plaintiff seeks damages and an injunction against the defendants prohibiting further acts of infringement.

The Case Scheduling Order provided for a Markman claim construction hearing before me (Doc. 71). The parties subsequently filed Markman briefs setting forth their disagreements (Docs. 98, 100).

The parties have identified the claims in each patent that are in dispute. Specifically, those claims are 6, 7, and 15 of the '744 patent and 1, 21, 29, 30, and 31 of the '520 patent. During the hearing on this matter (Doc. 107), the parties narrowed the dispute to the definition of six terms appearing in those claims. Accordingly, the Markman hearing focused on each party's construction of the disputed terms. No expert witnesses testified at the hearing, although the plaintiff submitted with its brief the affidavit of David

H. Kronengold, its engineering manager (Doc. 100, Ex. F).  Additionally, the parties provided copies of the relevant patents and other exhibits (Doc. 99, Exs. 1-5; Doc. 100, Exs. A-E).  Following the hearing, the parties submitted supplemental memoranda regarding a disputed issue raised for the first time by the defendants during the hearing (Docs. 108, 111).

## II.

The parties agree that "claims should be construed as one skilled in the art would construe them."  SmithKline Diagnostics, Inc. v. Helena Laboratories Corp., 859 F.2d 878, 882 (Fed. Cir. 1988).  The evidence bearing on claim construction is characterized as either intrinsic, or extrinsic, evidence.  The intrinsic evidence is "the patent itself, including the claims, the specification and, if in evidence, the prosecution history."  Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  In analyzing the intrinsic evidence, the court is to look first "to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention."  Id.

"[S]econd, it is always necessary to review the specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning."  Id.  The specification, which "is the single best

guide to the meaning of a disputed term," "contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it." Id. "Although words in a claim are generally given their ordinary and customary meaning, a patentee may choose to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the specific definition of the term is clearly stated in the patent specification or file history." Id.

Third, the court may consider the prosecution history of the patent, if it has been submitted. Id. The history may show express representations by the applicant to the Patent and Trademark Office concerning the scope of the claims and therefore may be of critical significance in determining their meaning. Id.

Frequently, "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term." Id. at 1583. In that event, "it is improper to rely on extrinsic evidence." Id. That is because, where the intrinsic evidence unambiguously shows the scope of the patented invention, a competitor is entitled to rely upon that public record to design around the invention. Id.

If, however, the intrinsic evidence does not resolve the meaning of a claim term, the court may look to extrinsic evidence as an aid to proper construction. Markman v. Westview Instruments, Inc., supra, 52 F.3d at 980-981. As the Federal Circuit explained in Markman (id. at 980):

> Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises. This evidence may be helpful to explain scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history. Extrinsic evidence may demonstrate the state of the prior art at the time of the invention.

"Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims." Id. at 981.

If, after considering all the intrinsic and extrinsic evidence, "there is an equal choice between a broader and a narrower meaning of a claim, and there is an enabling disclosure that indicates that the applicant is at least entitled to a claim having the narrower meaning," the court will adopt the narrower meaning. Athletic Alternatives, Inc. v. Prince Mfg., Inc., 73 F.3d 1573, 1581 (Fed. Cir. 1996). This principle is based upon the view that the patentee should give fair notice to competitors of the scope of his claims. Id.;

see also Markman v. Westview Instruments, Inc., supra, 52 F.3d at 978 ("[I]t is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude.").

Finally, this matter involves the interpretation of "means-plus-function" language, which signifies that a claim states a function without identifying specifically the structure that performs that function.  See 35 U.S.C. 112, ¶6.  Generally, the sources and guidelines for construing patent claims, discussed above, also apply in construing a means-plus-function claim.  Medtronic Inc. v. Intermedics, Inc., 799 F.2d 734, 742 (Fed. Cir. 1986), cert. denied, 479 U.S. 1033 (1987).  However, before determining the scope of coverage for such claims,  the structure that performs each claimed function must be identified from the patent specification.   Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205 (Fed. Cir. 2003), cert. denied, 541 U.S. 959 (2004).

### III.

The parties sought a hearing regarding the construction of certain terms in the patents at issue.  The parties' pre-hearing memoranda were hard to digest.  The defendants' memorandum, moreover, was far too long (which

was partly my mistake since I authorized its filing) and far too repetitious. The hearing consisted simply of oral argument and that argument helped illuminate matters significantly.  It also narrowed the terms that may be in dispute.   However, I would have liked testimony demonstrating and explaining how the pulley system worked.  Notably, neither side even brought in a bow as a demonstrative aid.  Further, I would have liked to have been advised of the context that created the disputes over the terms to be construed.

The presentation reminded me of cases in which motions in limine are filed before trial for resolution of several issues.  In my view, the best way to handle motions in limine is to defer them, if possible, because (1) the matter raised by the motion may not even come up at trial, or (2) the matter is resolved more easily when seen in context.  My feeling here is that, similarly, some of these terms may be construed with far less struggle when seen in the evidentiary setting, and at least one of the terms may not need to be construed at all.  Consequently, my suggestion is that the court not act on this Report and Recommendation until it needs to.  After all, "there is no legal requirement that the <u>Markman</u> hearing be held prior to trial."  <u>Firegear, Inc.</u>

v. Morning Pride Mfg., Inc., 215 F.3d 1341 (Table), 1999 WL 506744 at *2 (Fed. Cir. 1999).

In all events, I have carried out the task of conducting a Markman hearing. At that hearing, the parties reduced the number of terms needing construction to six, although the defendants sought to raise an additional matter at that time. With respect to the six terms in dispute, my view is that, upon the information provided, the plaintiff's proposed construction is preferred over the defendants' for the following reasons.

At the outset, a brief discussion of the archery bow helps to understand the issues in this matter. When an archer draws a bowstring, energy is stored in the bow limbs and later transferred to the arrow to propel it forward when the bowstring is released (Doc. 100, Ex. A, cl. 1). Of course, the amount of energy that can be stored in the bow limbs is limited due to the archer's physical capabilities. However, in approximately 1969, it was discovered that the amount of energy that can be stored in the bow limbs can be increased through the use of pulleys mounted on the limb tips. This type of bow is called a compound bow.

The Nurney patents are alleged to have improved upon previous compound bows.  Thus, Nurney asserted that his invention would drive the arrow farther, and enable the archer to aim at his target under less stress, than previous archery bows  (Doc. 100, Ex. A, cl. 6, l. 39-45; 53-55).  Each figure 1 in the '744 and the '520 patent illustrates Nurney's compound bow.  In short, it is an archery bow that has cam pulleys mounted on the tips of the bow limbs extending in both directions from the handle.   The bowstring and take-up string, which are sections of the same string, pass through the pulleys (id. at cl. 4, l. 65-68).  When the bowstring is pulled back from its resting position, the bowstring unwraps from the grooves of the bowstring cam pulley, which causes the pulleys to rotate.  The take-up string section then wraps on to the grooves of the take-up cam pulley sections, which pulls the limbs of the bow closer together and, concomitantly, stores energy which is transferred to the arrow upon release of the bowstring.

The ability of Nurney's compound archery bow to store optimally potential energy is shown graphically in a force-draw curve in figure 7 of each patent (id. at Ex. A,  fig. 7).  The curve labeled "F" depicts the draw force, which is the force in pounds applied to a bowstring to keep the

bowstring pulled back at any given point, which is measured in inches (id. at cl. 9, l. 52-60). The F curve shows that the draw force necessary to pull back the bowstring initially increases rapidly, is then followed by a period of substantially constant maximum force and, finally, a reduction in force as the bowstring approaches its full draw position. These draw force changes are categorized into four periods: increase, transition, constant, and force reduction.[2] The force-draw curve in figure 7 epitomizes the optimal retention of energy while reducing the amount of force necessary to hold the bowstring at full draw so the archer can aim better at the target.

As indicated, during the <u>Markman</u> hearing the parties discussed their disagreement regarding the construction of six terms appearing in certain patent claims that are said to be pertinent to the resolution of the plaintiff's infringement allegations. Each term, as well as an additional issue raised by the defendants during the hearing, is addressed below.

### 1. "Substantially a maximum"

### 2. "Substantially constant draw force"

---

[2]With the exception of the "increase" phase, these periods are identified on the force-draw curve in figure 7 as 'TRANS," "CONST. F," and "FORCE REDUCTION," respectively (Doc. 100, Ex. A, Fig. 7). The "increase" phase is discernable as the period between the markings at 8 and 14 pounds on the x axis.

These terms, which appear in claims 6 and 15 of the '744 patent, respectively, concern two characteristics of the draw force: the amount of force exerted on the bowstring and the period of time that a fairly consistent amount of force is sustained.  The claims provide (Doc. 100, Ex. A) (emphasis added):

> 6.   ...the improvement comprising each pulley means including structure to constitute means for requiring the **draw force** required to rotate the pulley means relative to the handle member **to be substantially a maximum** throughout draw of the bowstring effecting at least 25 percent of the total turning of the pulley means relative to the handle member which occurs during the entire draw of the drawstring.
>
> . . .
>
> 15.   ...drawing of the bowstring requiring a draw force which increases substantially linearly ... and thereafter **requiring a substantially constant draw** force to pull the bowstring during a substantial portion of the remaining draw distance.

These terms are construed together because, although they do not strike me as synonymous, the parties agree that, as used in the patents, they are synonymous (see Doc. 98, p. 17; Doc. 100, p. 9).  In this respect, the term "substantially a maximum" relates to the point when the draw force is near its

maximum.  Further, during the period a "substantially constant draw force" is achieved is also when the force exerted on the bowstring is at "substantially a maximum."  The parties further agree that these terms are depicted on the force-draw graph in figure 7 as "CONST. F," which is the horizontal plateau that is reached after the initial, rapid increase in force (see Doc. 100, Ex. A, fig. 7).

The parties' dispute concerns the percentage deviation from the maximum that constitutes "substantially a maximum" draw force.  The plaintiff contends that the term means achieving "at least 90% of the maximum draw force" (id. at p. 10).  The defendants, on the other hand, argue that 95% of the maximum draw force is "closer to what the intent of the patent is"[3]  (Doc. 107, p. 16).  Since the parties think the two terms under consideration are synonymous, apparently the term "substantially constant draw force" would, in the view of each side, indicate the same percentage.

The word "substantially" does not suggest to me an amount or degree that is quantified.  It simply means, as pertinent here, to a large degree

_____

[3]The defendants argued initially in their Markman brief that the term "substantially a maximum force" should be construed to mean "very minor deviations (less than 1%) from the absolute maximum force" (Doc. 98, p. 18).  They modified their position during the hearing on this matter.

or in the main.  Webster's Third New International Dictionary (unabridged ed. 1981), p. 2280.  There is nothing in its common meaning that indicates either that it could not be less than 90% or that it must be at least 95% or 99%.[4] Moreover, the plaintiff points out that the Federal Circuit has said that the term "substantially constant" denotes language of approximation (Doc. 100, p. 9).  Epcon Gas Systems, Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1031 (Fed. Cir. 2002).

Of course, the inventor can be his own lexicographer.  However, there is nothing in the patents that expressly defines the terms as meaning at least 90%.  Thus, nowhere in the patents does it say that "substantially a maximum" or "substantially constant draw force" means at least 90%.

Nevertheless, the parties seek to quantify the two terms.  And the plaintiff's construction is supported by language in each patent specification. Thus, as the plaintiff pointed out at the hearing, there are several references in each specification to 90% (Doc. 107, pp. 7-10).

------

[4]While reading a recent decision, I noted that a scientist in that case had expressed the opinion that the term "substantially similar" means 50% or more.  United States v. Brown, ___ F.3d ___, 2005 WL 1594456 (11th Cir. July 8, 2005).  That also is not my view of the common understanding of the word "substantially."

In contrast, the defendants do not refer to any language in the patents indicating 95% or 99%. Notably, the plaintiff, with candor, has provided an Arizona district court decision construing "substantially a maximum" and "substantially constant draw" in these patents to mean at least 95% of the maximum draw force (Doc. 100, Ex. E, p. 2). No explanation was given for this construction however. Moreover, defense counsel, also with candor, said at the hearing that he "think[s] that's wrong" (Doc. 107, p. 16).

The defendants argue that the conclusion that the two terms mean no less than 90% of the maximum draw force is inconsistent with the appearance of the force-draw curve during the "CONST. F" phase in figure 7, which appears to be a horizontal line with little, if any, deviation from the maximum force (Doc. 98, p. 35). Thus, the defendants argue that, since the curve during that period does not appear to deviate 10% from the maximum force, the conclusion that "substantially a maximum" can be as low as 90% of the maximum draw force is erroneous (see Doc. 107, pp. 15-16). However, the force-draw curve in figure 7 is simply the preferred embodiment of Nurney's invention and is not intended to be a limitation on the patent claims. Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed.

Cir. 1998); <u>Arlington Industries, Inc.</u> v. <u>Bridgeport Fittings, Inc.</u>, 345 F.3d 1318, 1327 (Fed. Cir. 2003).   Therefore, the appearance of the force-draw curve in figure 7 is not dispositive of the interpretation of the terms.

In sum, assuming, as the parties assert, that the two phrases under consideration should be stated in terms of a percentage despite the presence of the word "substantially," the plaintiff has the better of the argument.  Its construction is supported by language in the specification of each patent, while the defendants' construction is not.  The plaintiff's position, however, is not compelling, and I am not prepared to say that a full presentation of the matter would not shed a different light on the matter.  At the hearing I tried to get a better understanding of the dispute by inquiring concerning its relevance to the case and was simply told, without any details or context being provided, that it relates to infringement (Doc. 107, pp. 16-17, 19). Moreover, the plaintiff has confused the matter by filing the affidavit of Kronengold, an employee-engineer, who states that he understands the phrase "'substantially a maximum' ... to mean that the draw force is at least 90% of the maximum draw force," but then goes on to say that "[i]n any event, ... [he] would not associate the phrase 'substantially a maximum' (relative to a draw

force) as requiring any more than 95% of the maximum draw force" (Doc. 100, Ex. F, p. 6). Consequently, under these circumstances, I would want to hear what the inventor, any expert or any skilled artisan had to say about these terms before coming to a firm conclusion. At this point, however, I prefer the plaintiff's interpretation over the defendants' construction.

### 3. "Integrating means"

This phrase appears in claim 15 of the '744 patent and all of the '520 patent claims. It refers to the construction of the bowstring and take-up string pulley sections into a composite pulley. In this regard, the claim states (id. at Ex. A, cl. 22, l. 9-12):

> ... integrating means directly combining said bowstring cam pulley section and said take-up string cam pulley section of each pulley means in parallel side-by-side relationship for forming a unit....

The parties' dispute centers on the methods that may be used to construct the composite pulley. In this connection, the plaintiff argues that "integrating means" refers to either of two methods: (1) fabricating each pulley section separately and connecting them with bolts or screws to form a single structure; or (2) molding them as a unit out of a single piece of material (see id. at pp. 14-15). The plaintiff supports its contention with language

from the patent specification, which states (id. at Ex. A, cl. 6, l. 19-27)(emphasis added)):

> ... For convenience of manufacture, the bowstring pulley ... and the take-up string pulley ... can be **fabricated separately** and secured in proper rotative relationship **by connecting bolts or screws** ... so as to form an integral composite pulley structure.   **Alternatively the composite pulley can be molded as a unit** in plastic such as acetol resin or cast or machined as a unit in metal such as an aluminum alloy.

See also id. at cl. 14, l. 5-10 ("Fig. 10 shows the bowstring pulley section ... and the take-up string pulley section ... integrated into a unit ... whether the composite pulley is constructed in two sections that are assembled or is manufactured as a unitary article.").   Thus, the plaintiff argues that the specification clearly states that the composite pulley may be manufactured either way.

The defendants, on the other hand, argue that "integrated means" should be defined only as fastening the pulleys together with bolts or screws (Doc. 98, pp. 30-31).   In this connection, they argue that the second method is inconsistent with the claim language that refers to "integrating" and "combining" the pulleys (id.). Thus, the defendants contend that the

dictionary definitions of these words require the "joining together" of materials, which is contrary to molding the unit from one material (id.).

This argument is not persuasive because Nurney clearly stated his definition of the term "integrating means" in the specification (see supra, p. 18), and that is the "single best guide to the meaning of a disputed term." Vitronics Corp. v. Conceptronic, Inc., supra, 90 F.3d at 1582. Therefore, even if contrary to the dictionary definition, the meaning given a term in the patent specification is controlling. Texas Digital Systems v. Telegenix, Inc., 308 F.3d 1193, 1204 (Fed. Cir. 2002), cert. denied, 538 U.S. 1058 (2003). Consequently, I recommend that "integrating means" be construed to mean either (1) fabricating each pulley section separately and connecting them with bolts or screws to form a single structure; or (2) molding them as a unit out of a single piece of material.

### 4. "Draw force which increases 'substantially linearly' to 80% of draw force"

The phrase, which appears in claim 15 of the '744 patent and claim 31 of the '520 patent, states the description of the draw force as it changes from its resting position to the transition phase. In this connection, the claim states (Doc. 100, Ex. A, cl. 22, l. 24-28):

> ... rotation of the pulley means effected by drawing
> of the bowstring requiring a draw force which
> increases substantially linearly to a value of at least
> 80 percent of the maximum required draw force....

The parties' dispute concerns how far the line may deviate from a straight line on the force-draw curve of figure 7 while it ascends from its resting position to 80% of the maximum draw force. The plaintiff asserts that the straighter the line, the quicker the ascent towards maximum draw force, which, it contends (inexplicably to me (Doc. 107, pp. 35-45)), results in the storage of more potential energy for the release of the arrow.

The defendants urge that the incline of the force-draw curve in the prior art of Donald Kudlacek (id. at Ex. C, fig. 6) be superimposed on Nurney's patent as defining the permissible limit of deviation from a straight line during this initial phase of the force-draw curve (Doc. 98, p. 35). The Kudlacek patent involves a curved line with a slightly concave upward shape (Doc. 100, Ex. C, fig. 6). However, the defendants did not set forth an adequate basis for relying on Kudlacek's patent to define a term in Nurney's patent.[5]

---

[5]The defendants argue that their definition is appropriate because the Patent and Trademark Office Board of Appeals' initially rejected Nurney's use of "substantially linearly" in his patent application on the ground that it was already defined in Kudlacek's patent (Doc. 98, p. 34). However, as the defendants noted, one of the contested claims that matured into claim 15, which contains the "substantially linear" term, was subsequently

The plaintiff contends that the "substantially linearly" phrase should be defined as "the draw force ris[ing] along a substantially straight line, though not perfectly straight line, until the draw force reaches at least 80 percent of the maximum draw force" (Id. at p. 16).  This definition essentially mimics the language of the claim specification  (see id. at Ex. A, col. 9, l. 61-62) (the force-draw curve "increas[es] rapidly initially along a substantially straight steeply inclined line").  The defendants, however, argue that this description is too vague for a jury to apply, contending that "substantially" fails to quantify the limits of the line.

The defendant's opposition is not persuasive because it appears to pertain to the validity of the patent, which is not a matter at issue during a claim construction proceeding.  See Intervet America, Inc. v. Kee-Vet Laboratories, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989).  Moreover, the vagueness concern seems to lack force because the factfinders will most likely be familiar with the term "substantially" (even if it is not further explicated with a dictionary definition) and, therefore, should be able to apply their

---

allowed over Kudlacek (id.).  Consequently, the basis for the defendants' continued reliance on the Kudlacek patent as defining the parameters of Nurney's term "substantially linear" is unclear.

common understanding to determine whether a particular line is substantially straight.

In all events, there does not appear to be a meaningful dispute about this phrase because the plaintiff does not challenge the proposition that the Kudlacek force-draw curve exceeds the maximum amount of curvature contemplated for these claims (Doc. 107, pp. 52-53). Thus, plaintiff's counsel stated at the hearing that the rise in the Kudlacek curve is beyond what the plaintiff would consider substantially linear (id.). Consequently, plaintiff's counsel agreed that, if the defendants' bow produces a line as in the Kudlacek patent, there would be no infringement of the plaintiff's patents in that respect because Nurney's claims contemplate a straighter line. Accordingly, it appears for the purpose of this dispute, this matter can be resolved by making the limited determination that the curve illustrated in the Kudlacek patent exceeds the curvature permissible with regard to the production of an increase 'substantially linearly' in the draw force from rest to 80% of the maximum draw force.

**5.   "Substantial portion of remaining draw distance"**

This phrase appears in claim 15 of the '744 patent and pertains to the minimum percentage of the total draw displacement that the draw force remains substantially constant (Doc. 100, p. 16). This term is illustrated in figure 7 of the force-draw graph as the horizontal plateau labeled "CONST. F" (id. at Ex. A, fig. 7). The plaintiff contends that the term "substantial portion of remaining draw distance" means that a substantially constant draw force must be maintained for a minimum of 30% of the total draw distance. The defendants argue that this percentage should be at least 37½% of the total draw distance.

The plaintiff's contention is based upon Nurney's patent specification which states (id. at cl. 16, l. 15-18)(emphasis added)):

> ... the maximum draw force be maintained substantially constant throughout a bowstring draw displacement proportion of **30 percent** to 50 percent of the total bowstring draw displacement.

Thus, the plaintiff argues that the defendants' proposed construction of this phrase is flatly contradicted by the patent specification.

The defendants acknowledge that the patent specification refers to 30% as the low range for maintaining a substantially constant draw force (Doc. 100, Ex. A, cl. 16, l. 8). However, they argue that this reference is not dispositive because they calculated the distance of the substantially constant

portion of the "F" curve in figure 7 and found it to encompass 37 ½ % of the total draw distance (Doc. 98, p. 36).

This argument is unpersuasive because the patent is not restricted to the examples, but is defined by the words in the claims and specification. General Elec. Co. v. Nintendo Co., Ltd., 179 F.3d 1350, 1358 (Fed. Cir. 1999). Here, the language of the specification expressly states a minimum of 30% and not 37½%. Furthermore, the defendants' proposed interpretation of 37½% is inconsistent with a second example in the force-draw graph showing a substantially constant draw distance that is about 32% of the entire draw (Doc. 100, p. 17; see Doc. 107, pp. 56-57).[6]

Consequently, based on the clear terms of the patent specification, those skilled in the art would understand the  phrase "during a substantial portion of the remaining draw distance" to mean that there is a substantially constant draw force for a minimum of 30% of the bowstring draw displacement.

### 6.  The angular relationship between two pulley sections

---

[6]The defendants also argue that there is nothing in the specification to support the conclusion that a range of 30% for maintaining a maximum draw force is possible (Doc. 98, p. 36).  However, as the defendants acknowledged at the hearing, that matter goes to the issue of validity and not claim construction (Doc. 107, p. 58).  Intervet America, Inc. v. Kee-Vet Laboratories, Inc., supra, 887 F.2d at 1053.

This dispute, which concerns all of the claims at issue in this case, relates to the angular relationship of the major axes of the bowstring and take-up pulley sections to each other. In this regard, the patent specification states (Doc. 100, Ex. B, cl. 14, l. 5-14 (emphasis added)):

> FIG 10 shows the bowstring pulley section 9 and the take-up string pulley section 11 integrated into a unit.... In such integrated relationship the planes perpendicular to the respective pulley sections in which **the major axes of the two sections lie cross at a substantial angle**, preferably being substantially mutually perpendicular.

The plaintiff contends that the angular relationship between the major axes should be construed as merely requiring the formation of a "substantial angle" (Doc. 100, p. 11). Thus, it says that, while the relationship could not be no angle at all, it could be a 45 degree angle (Doc. 107, p. 80).

The defendants argued at the hearing that the angles must be substantially perpendicular (Doc. 107, pp. 66-67). However, the specification expressly states that the major axes lie "at a substantial angle." While the specification refers to "being substantially mutually perpendicular," that was simply a preferred embodiment, which, as indicated, does not constitute a claim limitation. General Elec. Co. v. Nintendo Co., Ltd., supra, 179 F.3d at 1358. Similarly, the fact that the drawings show that these axes are

perpendicular to each other does not amount to a claim limitation.  <u>Advanced Cardiovascular Systems</u> v. <u>Scimed Life Systems, Inc.</u>, 261 F.3d 1329, 1339 (Fed. Cir. 2001)(simply because the drawings show the elements in parallel relationship is insufficient in itself to add such a limitation to the claims).

The defendants additionally argue that, construing the angular relationship of the major axes of the bowstring and take-up pulley as forming a "substantial angle" is vague and, therefore, such a construction would render the claim invalid for indefiniteness (Doc. 107, p. 75).  However, as indicated, the validity of this interpretation is not properly addressed in the claim construction proceeding.  <u>Intervet America, Inc.</u> v. <u>Kee-Vet Laboratories, Inc.</u>, <u>supra</u>, 887 F.2d at 1053 ("Ambiguity, undue breadth, vagueness, and triviality are matters that go to claim *validity* for failure to comply with 35 U.S.C. §112-¶2, not to interpretation or construction").

Therefore, based on the plain language of the patent specification, I recommend that the angular relationship between the two pulley sections be construed as requiring the formation of a "substantial angle."  It is appropriate to add, however, that the potential challenge to the validity of the patents on vagueness grounds as a result of this construction would seem to provide further reason for deferring the difficult construction

of "substantially a maximum," "substantially constant draw force," and "substantially linearly."

### 7. Turning pulleys "between 200 and 270 degrees"

This phrase appears in claim 15 of the '744 patent. The claim states that (Doc. 100, Ex. A, cl. 22, 1.4-9):

> [the] bowstring cam pulley section and take-up string cam pulley section are of a size and shape to constitute turning means for effecting turning of each of the pulley means relative to the bow handle member during draw of the bow through an angle between 200 degrees and 270 degrees....

There is no dispute regarding the function described in this claim or the claim's meaning. Rather, the defendants argue that there has not been adequate identification of the structures that enable the cam pulley sections to perform the function of rotating through an angle of between 200 degrees and 270 degrees during the draw of the bow (Docs. 108, p. 3; 111, p. 2). The defendants did not address this issue in their Brief on Claim Construction (Doc. 98). Instead, they raised the issue at the end of the <u>Markman</u> hearing. Consequently, the parties were given an opportunity to submit supplemental memoranda on this issue (Docs. 108, 111).

In this connection, the plaintiff contends that the court should "regard the structure that performs th[e]... function [in claim 15] as simply being the contour, or periphery, of the bowstring cam pulley section and take-up string cam pulley section, shaped to cause each of the composite pulleys to rotate, relative to the bow handle member, during draw of the bow, through an angle  between 200 degrees and 270 degrees" (Doc. 111, pp. 9-10).  The plaintiff bases its contention on language from the patent specification and the Joint Claim Construction Statement.

The defendants, on the other hand, contend that the corresponding structures for the functioning of this claim should be based on measurements and/or scale of the dimensions of the drawings in the patent specification.  In this connection, they propose that the structures be identified as (Doc. 108, p. 12):

> a.  the bowstring cam pulley section and take-up string cam pulley section having sizes that are directly measured from Figures 8 and 9 or are scaled Figure 1 [sic] in proportion to the linear dimension provided for length A-A;
>
> b. the bow limbs having a length that is scaled from Figure 1 in proportion to the linear dimension provided for length A-A; and
>
> c. the nocking point displacement being within the range of 21 inches to 24.5 inches.

The defendants argue that these quantitative limitations are necessary because claim 15 will otherwise be invalid for indefiniteness.  See Budde v. Harley Davidson, Inc., 250 F.3d 1369, 1376-77 (Fed. Cir. 2001), cert. denied, ___ U.S. ___, 125 S.Ct. 1941 (2005)(inadequate disclosure of a corresponding structure is pertinent to the validity of a claim with a means-plus-function clause because without such structure the claim will be deemed invalid for indefiniteness).

Any disagreement here does not fall within the scope of a claim construction hearing.  As indicated, the parties do not dispute the meaning of the quoted language in the claim.  That is most likely the reason this matter was not presented in the parties' claim-construction memoranda.  The defendants, in essence, are raising an argument that goes to the issue of validity.  That issue is not properly considered now.  Intervet America, Inc. v. Kee-Vet Laboratories, Inc., supra, 887 F.2d at 1053.

V.

For the foregoing reasons, I recommend that the six terms that were the focus at the Markman hearing be given the construction proposed by the plaintiff.  I suggest, however, that it might be beneficial to delay resolving the construction until after the evidence has been presented at trial.  Further,

the issue raised belatedly by the defendants regarding the turning of the pulleys should similarly be deferred.

Respectfully submitted,

DATED: JULY 28, 2005

THOMAS G. WILSON
UNITED STATES MAGISTRATE JUDGE

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal.  28 U.S.C. 636(b)(1).